UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GREGORY LEAGUE,

        Petitioner,

                                  CASE NO. 05-CV-74926-DT

  v.                            JUDGE AVERN COHN

                                  MAGISTRATE JUDGE PAUL J. KOMIVES

BLAINE C. LAFLER,

        Respondent.

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Convictions* . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.    *Procedural Matters* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          1.    *Statute of Limitations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          2.    *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    E.    *Jury Instructions (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
               a. Lesser Offense Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
               b. Specific Intent and Accident Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
               c. Causation Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
               d. Inferring State of Mind Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    F.    *Prosecutorial Misconduct (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    G.    *Judicial Partiality (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    H.    *Sufficiency of the Evidence (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    I.    *Ineffective Assistance of Counsel (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
               a. Investigation/Knowledge of the Law/Choice of Defense . . . . . . . . . . . . . . . . . . . 35
               b. Failure to Call Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
               c. Failure to Challenge Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
               d. Failure to Object to Prosecutorial Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . 42
               e. Failure to Request Jury Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

J.       *Cumulative Error (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
K.      *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
III.       NOTICE TO PARTIES REGARDING OBJECTIONS   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

\*      \*      \*      \*      \*

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.    REPORT:

A.    *Procedural History*

1.    Petitioner Gregory League is a state prisoner, currently confined at the Carson City Correctional Facility in Carson City, Michigan.

2.    On June 13, 2001, petitioner was convicted of first degree felony murder, MICH. COMP. LAWS § 750.316; and first degree child abuse, MICH. COMP. LAWS § 750.136b(2), following a jury trial in the Wayne County Circuit Court. On June 28, 2001, he was sentenced to a mandatory term of life imprisonment without possibility of parole. Petitioner's motion for a new trial was denied by the trial court.

3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

> I.    WHERE APPELLANT ALLEGED THAT HIS ATTORNEY WAS INEFFECTIVE BECAUSE HE FAILED TO ASK FOR A LESSER INCLUDED OFFENSE ON THE PREDICATE OFFENSE FOR FELONY MURDER, FAILED TO INVESTIGATE THE THEORIES HE USED AND RESEARCH THE LAW ON THESE THEORIES, TOLD THE JURY HE WOULD CALL A WITNESS AND THEN FAILED TO CALL HER, FAILED TO CHALLENGE DEFENDANT'S INCULPATORY STATEMENTS, FAILED TO OBJECT TO ERRONEOUS JURY INSTRUCTIONS AND PROSECUTORIAL MISCONDUCT, THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A NEW TRIAL AND THE REQUEST FOR GINTHER HEARING

> II.    WHERE THE COURT FAILED TO INSTRUCT THE JURY ON SPECIFIC

INTENT AS AN ELEMENT OF CHILD ABUSE FIRST DEGREE, FAILED TO INSTRUCT ON CAUSATION AND FAILED TO INSTRUCT ON INFERRING STATE OF MIND THE APPELLANT WAS DENIED HIS RIGHT TO A JURY TRIAL AND TO DUE PROCESS OF LAW.

III. PROSECUTORIAL MISCONDUCT DENIED APPELLANT A FAIR TRIAL IN THE FOLLOWING WAYS:

1. THE PROSECUTION ARGUED THAT APPELLANT'S LACK OF EMPLOYMENT AND POVERTY WERE THE CAUSE OF THE CRIME.

2. THE PROSECUTION ASKED THE JURY TO SYMPATHIZE WITH THE VICTIM, AND SHE VOUCHED FOR HER CASE.

3. THE PROSECUTOR MADE A CIVIC DUTY ARGUMENT.

4. A PROSECUTOR MAY NOT ARGUE FACTS NOT PLACED BEFORE THE JURY NOR MAY A PROSECUTOR MISSTATE THE LAW.

IV. THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE VERDICT WHERE PROOF OF DEFENDANT'S MENTAL STATE WAS SPECULATIVE AT BEST.

V. THE TRIAL JUDGE PIERCED THE VEIL OF JUDICIAL IMPARTIALITY, INVADED THE PROVINCE OF THE JURY, AND DENIED THE APPELLANT THE RIGHT TO PRESENT A DEFENSE, THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, THE RIGHT TO A FAIR TRIAL, AND THE RIGHT TO AN IMPARTIAL JURY.

VI. THE SEVERAL CONSTITUTIONAL ERRORS IDENTIFIED IN THIS CASE, WHEN CUMULATED, ESTABLISH THAT APPELLANT SUFFERED ACTUAL PREJUDICE IN VIOLATION OF THE DUE PROCESS CLAUSE.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. League*, No. 237168, 2003 WL 21675849 (Mich. Ct. App. July 17, 2003) (per curiam).

4. Petitioner, through counsel, sought leave to appeal these issues to the Michigan

Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard

order.  *See People v. League*, 471 Mich. 883, 688 N.W.2d 505 (2004).

5.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on December 29, 2005.  As grounds for the writ of habeas corpus, he raises the claims that he raised in the state courts, although appellate claims IV and VI are presented as a single claim.

6.     Respondent filed his answer on July 17, 2007.  He contends that petitioner's claims are barred by the statute of limitations.  He also contends that petitioner's jury instruction and prosecutorial misconduct claims are barred by petitioner's procedural default in the state courts.  Finally, respondent argues that all of petitioner's claims are without merit.

B.     *Factual Background Underlying Petitioner's Convictions*

The evidence underlying petitioner's convictions was thoroughly detailed by the Michigan Court of Appeals:

> This case arises from the scalding and subsequent death of 2-1/2 year old Alize Charvelle Williams. The prosecution's theory of the case was that defendant was angry with Alize for defecating in her Pull-Up and punished her by immersing her in scalding water in the bathtub. The defense theory of the case was that Alize was in the bathtub and was accidentally injured when she turned on the hot water after defendant left the bathroom to answer the telephone.
>
> Alize was the daughter of defendant's girlfriend, Diamond Dorsey. On November 26, 2000, Officer Susan Upton of the Inkster Police Department was dispatched to 1820 Heatherwood, Apartment 103, in Inkster in response to a 911 call regarding a "scalded child in a tub." When she arrived at the apartment at 4:49 p.m., she observed defendant standing in the doorway to the apartment. Defendant stated that, "I was trying to give her a bath and I guess it was too hot." Officer Upton turned and saw a naked child lying in a fetal position on a blue towel in the hallway. Alize was bright red from her chin to her toes, skin was missing, and flesh was hanging from her body. Alize was semi-conscious and was crying. Officer Upton observed large pieces of flesh trailing from the hallway into the bathroom. The water in the tub had been drained, and there were pieces of flesh surrounding the drain area of the tub and on the side of the tub.
>
> Officer Dean Toward of the Inkster Police Department testified that as he approached the apartment he heard a "loud football game on TV." He observed defendant standing in the doorway of the apartment watching the TV. Defendant told Officer Upton that he was filling the tub with water and the water "turned hot and

burned his stepdaughter." Defendant indicated that he was in the next room watching football at the time. Officer Toward noticed a stench in the apartment. When he went into the bathroom he noticed the smell of feces and observed flesh sticking to the side of the tub.

Alize was wrapped in sterile wrappings and taken by ambulance to Anapolis Hospital. Donald Ray Schipper, an emergency room physician at Anapolis Hospital, testified that Alize was at Anapolis Hospital for approximately thirty to forty-five minutes before she was transferred to a comprehensive burn center. He indicated that Alize was burned from head to toe and that the skin was off her entire body except for a small area on her right hand and her face. She suffered from "full thickness burns all over" and "whole sheets of her skin were dripping off." Alize was sent to the University of Michigan by helicopter. Dr. Schipper testified that he had "never seen someone burned to this extent" and that someone with such burns generally would not survive.

Dr. Elaine Pomeranz, the Medical Director of the Child Protection Team of the Pediatric Department at the University of Michigan Medical Center, was qualified as an expert in forensic pediatric medicine and as a specialist in evaluating burns in children. The Trauma Burn Team at the University of Michigan consulted her with regard to child abuse in this case. The child suffered burns over ninety percent of her body. Her burns were deep partial (2 degree) and full (3 degree) thickness burns. Dr. Pomeranz testified that burns significantly impair body functions and organ functioning. She has never seen a child burned as badly as Alize who survived. She noted a sharp line of demarcation at Alize's neck just under the chin and at the wrist. Dr. Pomeranz testified that the burns were scald burns and that the burns were not accidental. She explained that the injury could not be sustained voluntarily because a person of Alize's age would respond to the hot water and try to get out of the very painful situation. She indicated that immersion for fifteen to twenty seconds would be required in order to result in the extensive burns Alize suffered.

An investigation was conducted by the police department to determine the temperature of the water. Officer Upton testified that the hot water ran for twenty-five seconds before the water became too hot and she had to remove her hand from the water. A test of the water temperature indicated that the water was between 135 and 140 degrees when the water was at the "scum" level of the tub, approximately seven inches deep.

Dr. Wendy Wahl, the Director of Critical Care Services for the Trauma Burn Unit at the University of Michigan Medical Center, was qualified as an expert in trauma burns. She was Alize's admitting physician. Dr. Wahl testified that Alize was burned over ninety percent of her body, with the exception of her right hand and from the chin up. This was the worst scald burn she had ever seen. Dr. Wahl explained that the blood flow in a severely burned body is compromised and that Alize suffered infections and pneumonia and that she started growing bacteria out of her body. Several skin grafts using cadaver skin were attempted, but bacteria

invaded Alize's blood, lungs, and wounds, and her organs began to die. On December 22, 2000, Dr. Wahl concluded that death was inevitable.

Diamond Dorsey testified that she met defendant in January 2000 and that they began living together in June 2000. Defendant often babysat Alize. Alize was in the process of being potty trained and wore Pull-Ups. Dorsey explained that Alize would occasionally relieve herself in her Pull-Up. Dorsey testified that defendant was the only adult home when she left for work on November 26, 2000. She testified that defendant called her at work and that she went home. When she arrived at home, the police told her that her daughter was badly burned and had been taken to the hospital.

Three statements were obtained from defendant in defendant's own handwriting. Defendant was given his Miranda rights before each statement. In the third statement, defendant said that his first two statements were lies. In his third statement, defendant wrote:

> I was watching the game while the baby was eating. After a while she was done. I told her to come here so I can check her pull-up. While I was checking it, she used it in the pull-up. So I got mad then told her to go to the potty.
>
> Later I went in to see if she was done. She was almost done. So I told her to sit down again. Two minutes I went back in there, and she was done. So I took off her socks and her pull-up and started running the water.
>
> After it got about five to six inches, I put her in there, and she wouldn't sit down, and she started moving her hands around. But I told her to sit down, and she wouldn't at first. So I took her by the hand and sat her down myself. Started to wash her up, but the phone rang. So I went to answer it.
>
> While I was on the phone, the baby was kicking and crying, but I didn't pay her no attention.
>
> So I got off the phone and then looked at the game for a minute, and then I went back to the bathroom because the baby was crying, "it's hot."
>
> So I got in there, got her out and there she burned. So when I saw that, I freaked out. Then ran to the phone. Called her mother and told her what happened, and she said, "calm down." I'll be there in a minute."
>
> So after that I called 911.

Defendant's statement then continued in a question and answer format with Detective O'Brien asking specific questions, and with each answer being written by defendant and initialed by him at the end at the end of the statement:

Q. Did you touch the water when you "started" to bathe her?

A. No, I didn't.

Q. What did you do when you put her in the water?

A. She was moving her hands saying it was hot.

Q. Did you push her to the bottom of the tub?

A. Yes. I grabbed her and sat her down.

Q. Were you angry with her at this time? I'm sorry. Were you angry at her at this?

A. Yes; I was mad at her at that time because she used the bathroom in her pull-up.

Q. Were you still mad at her when you went to watch the game?

A. No. I was not still mad at her because its normal.

Q. Are the other statements you've made to us true or false?

A. All the other statements was false because I was scared.

Q. Is this the only truthful statement you have made to us about this incident?

A. Yes. This is the full truth period.

Detective Martin testified that defendant never indicated that the child turned on the water.

Detective Barry O'Brien of the Inkster Police Department testified that he talked to defendant after reviewing defendant's first statement. Defendant did not appear upset and did not ask about the child's condition. Defendant talked about the football game that he watched the evening of the incident and about the telephone call that he received. Defendant indicated that he checked on Alize approximately four or five minutes after he first heard her yell. He did not check on her immediately because he was watching the football game.

Dr. Bader Cassin, a forensic pathologist and medical examiner, performed the December 23, 2000, autopsy. He explained that Alize was 35-1/2" tall and weighed forty-three pounds. She was burned over ninety-percent of her body. Areas not burned included her face, some of her skin folds, the outside of her vagina, and her right hand from the wrist out. Dr. Cassin testified that the burns were immersion scald burns and were partial to full thickness burns. He opined that the burns were not accidental because a body's natural reflex would be to escape the pain quickly, and Alize was of sufficient size and age to be able to climb out of the tub. He explained that a child would have had to be continuously immersed for this type of injury to occur. Dr. Cassin testified that nobody would survive this extent of burns. He explained that the manner of death was homicide. Dr. Cassin opined that Alize was grabbed by the hand and placed into the water. The injury pattern suggested that the body was forced into the water in a seated position first, but that the knees were close together, keeping the groin tissue preserved. He further opined that a hand was placed on Alize's face to force her into the water.

Defendant testified that he moved in with Dorsey in June 2000. He testified that he lost his job in September 2000 as a result of being unable to work overtime because he had to get home in time to watch Alize before Dorsey left for work. He

generally bathed Alize at least twice a week. On the day of the incident, Alize woke up at 12:30 p.m., and defendant was watching TV. He told Alize to go to the bathroom. Defendant then changed Alize's diaper and gave her lunch while he watched TV. After lunch, defendant told Alize to take off her Pull-Up and go to the bathroom. Defendant then emptied the potty seat and ran a bath for Alize. Alize complained that the water was too hot, but defendant was not concerned because she would "always say that." Defendant was going to bathe Alize when the phone rang. After concluding the telephone call, defendant started to watch TV. Defendant could hear Alize playing in the bathroom. When defendant went into the bathroom, he saw Alize floating in the tub with the hot water running. The water was too hot to touch, so defendant turned off the water and drained the tub before removing Alize from the tub.

Defendant wrapped Alize in the towel and stood her up outside the tub. He then called Dorsey and then called 911. After making the calls, defendant observed Alize lying on the floor beside the toilet. He wrapped her up and put her in the hallway. Defendant then went to the front door to see if the police had arrived. When Officer Upton arrived, she went to the child. Defendant then sat in the hallway until the ambulance arrived.

Defendant testified that he only stated in the third statement that the first and second statements were false because that is what the police officers wanted him to say. Defendant admitted that he was frustrated because Alize was not potty-trained, and he also admitted that the testimony he was giving was different than any other statement he had made in the past. Defendant admitted that he never before told anyone that Alize turned on the water

Defendant presented three character witnesses who testified that defendant is non-violent and has a good reputation for honesty

On rebuttal, Dr. Cassin testified that defendant's version of the events was not consistent with the evidence. He testified that Alize's injuries were not consistent with a body that was stretched out and "floating." Dr. Cassin explained that if Alize had been floating on her back, sparing would not be present on her body, yet the body had sparing in several places.

*League*, 2003 WL 21675849, at *1-*5, slip op. at 1-5.

C.     *Procedural Matters*

1.     *Statute of Limitations*

Respondent contends that petitioner's claims are barred by the statute of limitations.  In relevant part, the AEDPA amended 28 U.S.C. § 2244 to provide a one year statute of limitations for habeas petitions.  Specifically, the statute as amended by the AEDPA provides:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–

(A) the date on which the judgment became final by the conclusion of direct review of the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).[1]

As the language of the statute indicates, there are four possible dates on which the limitations period may begin to run; only the first is applicable here. Under subparagraph (A) of § 2244(d),

a judgment of conviction does not become "final" . . . until the Supreme Court affirms the conviction and sentence on the merits or denies a timely filed petition for certiorari.

In addition, if a defendant does not file a certiorari petition, the judgment of conviction does not become "final" until the time for seeking certiorari review expires.

*Kapral v. United States*, 166 F.3d 565, 570-71 (3d Cir. 1999); *see also*, *United States v. Simmonds*, 111 F.3d 737, 744 (10th Cir. 1997) (conviction became final upon denial of certiorari); *Torres v. Irvin*, 33 F. Supp. 2d 257, 271 (S.D.N.Y. 1998) ("[A] judgment of conviction only becomes final upon the expiration of the ninety days to seek a writ of certiorari from the United States Supreme

---

[1]The AEDPA codified a one-year statute of limitations provision for motions to vacate federal convictions brought under 28 U.S.C. § 2255 which is nearly identical to the one found in § 2244(d)(1). *See* 28 U.S.C. § 2255 para. 6. Accordingly, cases discussing the § 2255 statute of limitations are applicable here.

Court."); *United States v. Dorsey*, 988 F. Supp. 917, 918 (D. Md. 1998) (same); *cf. Penry v. Lynaugh*, 492 U.S. 302, 314 (1989) (for purpose of determining whether application of new rule of law would be an impermissible retroactive application to a case which has already become final, conviction becomes final upon denial of the defendant's petition for certiorari); *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987) ("By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.").

Here, the Michigan Supreme Court denied petitioner's application for leave to appeal on September 28, 2004, and his conviction became final 90 days later when his time for seeking *certiorari* in the United States Supreme Court expired, or on December 27, 2004. His one year period in which to file his habeas petition therefore expired on December 27, 2005. Petitioner's habeas application was not filed in this Court, however, until December 29, 2005, seemingly rendering his petition untimely.

However, this analysis fails to take account of the prisoner mailbox rule. Under this rule, which is based on a prisoner's inability to physically access the courthouse and his need to entrust his pleadings to prison officials, a habeas petition is deemed "filed" for purposes of the statute of limitations on the date the petitioner gives his application to prison officials for mailing. *See In re Sims*, 111 F.3d 45, 47 (6th Cir. 1997); *Beckovich v. Coyle*, 22 F. Supp. 2d 722, 723 (N.D. Ohio 1998); *cf. Houston v. Lack*, 487 U.S. 266, 270 (1988). Ordinarily, the Court will assume that the petition was given to prison officials on the date that the petitioner signs his petition. Here, however, petitioner failed to date his petition. He certainly gave his petition to prison officials no later than December 28, 2005, in order for it to be received in the mail by this Court on December

29, 2005. It is likely that the mailing took longer than one day, and it is therefore likely that petitioner gave his habeas application to prison officials for mailing on December 27 or earlier, thus rendering his petition timely. However, without conducting an evidentiary hearing or otherwise expanding the record, there is no way to determine the date on which petitioner gave his habeas application to prison officials for mailing.

Although the issue of whether a claim is barred on a procedural ground should ordinarily be resolved first, "judicial economy sometimes dictates reaching the merits [of a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo,* 169 F. 3d 1155, 1162 (8th Cir. 1999). As explained in the following sections of this Report, petitioner's habeas claims are without merit. Because it cannot readily be determined on what date petitioner "filed" his habeas application, it is more efficient to deny petitioner's claims on the merits "than to untangle the complexities of the timeliness issue." *See Jones v. Bowersox,* 28 Fed. Appx. 610, 611 (8th Cir. 2002).

2. *Procedural Default*

Respondent also contends that petitioner's jury instruction and prosecutorial misconduct claims are barred by petitioner's procedural default in the state courts. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only

11

a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Here, the Michigan Court of Appeals declined to review petitioner's claims (other than for plain error) because he had failed to object to the jury instructions and alleged instances of prosecutorial misconduct at trial. *See League*, 2003 WL 21675849, at *10, slip op. at 11; *id.* at *11, slip op. at 11. This constitutes an adequate and independent state rule barring habeas review. However, petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his trial counsel was ineffective for failing to raise these objections. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). And whether counsel was ineffective depends, in part, on the underlying merits of the defaulted claims. Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D.

Mich. 2002) (Tarnow, J.).

E.      *Jury Instructions (Claim II)*

Petitioner first contends that he was denied a fair trial by the trial court's failure to give several instructions to the jury.[2]  Specifically, petitioner contends that the jury should have been instructed on: second degree child abuse as a lesser included offense; specific intent; causation; and inferring state of mind.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

In order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal). As the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'"  *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  If an instruction is ambiguous and not necessarily erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.  *See Estelle*, 502 U.S.

_____

[2]Petitioner's first claim is actually his ineffective assistance of counsel claim.  Because petitioner's allegations of ineffective assistance of counsel are largely derivative of his other substantive claims, I address the ineffective assistance of counsel claim last.

at 72 & 73 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990). In short, instructional errors of state law will rarely form the basis for federal habeas corpus relief. *See Estelle*, 502 U.S. at 71-72.

2. *Analysis*

*a. Lesser Offense Instruction*

Petitioner first argues that the jury should have been given an instruction on second degree child abuse as a lesser included offense of first degree child abuse. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Although the Eighth Amendment and the Due Process Clause require that a trial court instruct the jury on lesser included offenses in the context of a capital case, *see Beck v. Alabama*, 447 U.S. 625, 637-38 (1980) (trial court required to instruct *sua sponte* on lesser included offenses where the failure to do so would result in the jury being given an "all or nothing" choice of convicting on the capital charge or acquitting the defendant), "the Constitution does not requires a lesser-included offense instruction in non-capital cases." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001). As the Sixth Circuit has noted, even where a lesser offense instruction is requested, the failure of a court to instruct on a lesser included or cognate offense in a non-capital case is generally "not an error of such magnitude to be cognizable in federal habeas corpus review." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc); *see also*, *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002). At a minimum, there is no clearly established Supreme Court law which requires the giving of a requested lesser offense instruction in the non-capital context, as is required for habeas relief under § 2254(d)(1). *See Samu v. Elo*, 14 Fed. Appx. 477, 479 (6th Cir. 2001); *Kuroda v. Bell*, No. 2:07-CV-12310, 2007 WL 1657410, at *2 (E.D. Mich. June 7, 2007) (Cohn, J.); *Adams v. Smith*, 280 F. Supp. 2d 704, 717 (E.D. Mich. 2003) (Tarnow, J.). Thus, the Michigan

Court of Appeals's resolution of this claim was not contrary to, or an unreasonable application of, clearly established federal law, and petitioner is therefore not entitled to habeas relief on this claim.

### b.  Specific Intent and Accident Instructions

Petitioner also contends that the trial court should have instructed the jury on specific intent by reading MICHIGAN CRIMINAL JURY INSTRUCTIONS 2D (CJI2d) § 3.09.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Although the trial court did not give the explicit specific intent instruction, the court did instruct on the mental state required for second degree murder, and that to establish first degree murder the prosecution had to prove beyond a reasonable doubt all the elements of second degree murder plus the added element that the murder occurred while petitioner was committing or attempting to commit first degree child abuse.  *See* Trial Tr., dated 6/13/01, at 136-38.[3]  The trial court also explicitly instructed the jury that "[i]f you find that there is a reasonable doubt about one or more of the elements of *either offense*, you would find the defendant not guilty" of first degree murder.  *Id*. at 136 (emphasis added).  With respect to first degree child abuse, the court instructed the jury that the prosecution had to prove beyond a reasonable doubt that petitioner "knowingly or intently [sic] caused serious physical harm to Alize Williams."  *Id*. at 138.  Thus, the instructions as given informed the jury that it could find petitioner guilty of first degree child abuse only if he knowingly or intentionally caused serious physical harm, and that it could convict petitioner of first degree felony murder only if it concluded beyond a reasonable doubt that petitioner was guilty of first degree child abuse.  Thus, the instructions adequately conveyed to the jury the specific intent

---

[3]Inexplicably, the portion of the trial transcript containing the court's instructions to the jury is not among the Rule 5 materials submitted by respondent.  However, a copy of the relevant portions of the transcript is included as Appendix C to petitioner's brief.

required to convict petitioner. *See United States v. Gibbs*, 182 F.3d 408, 433 (6th Cir. 1999); *Terry v. Bock*, 208 F. Supp. 2d 780, 793 (E.D. Mich. 2002) (Gadola, J.), *aff'd*, 79 Fed. Appx. 128 (6th Cir. 2003); *cf. Henderson*, 431 U.S. at 155 ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.").[4]

Similarly, petitioner was not denied a fair trial by the absence of an instruction on accident. Petitioner presented his accident theory to the jury and, if the jury believed petitioner's version of events, it could not have found petitioner guilty based on the court's instructions regarding the intent element of first degree child abuse. As the Michigan Court of Appeals reasonably explained, "the jury was instructed that it could not convict defendant if the prosecution did not prove that defendant had the requisite intent to commit the crime. Thus, if the jury chose to believe defendant's theory of accident, it would have been required to find him not guilty of first-degree child abuse." *League*, 2003 WL 21675849, at *8, slip op. at 8-9. Thus, the instructions as a whole adequately covered petitioner's accident defense. *See Charlton v. Davis*, 439 F.3d 369, 373 (7th Cir. 2006). Accordingly, the Court should conclude that petitioner is not entitled to relief on this claim.

### c. Causation Instruction

Petitioner next argues that he was denied a fair trial by the court's failure to give an instruction on causation pursuant to CJI2d § 16.15. This instruction provides: "It is not enough that the defendant's act made it possible for the death to occur. In order to find that the death of [name

---

[4]Interestingly, shortly after petitioner's conviction the Michigan Supreme Court determined, in a first degree child abuse case, that CJI2d § 3.09 on specific intent should not be given because it could confuse the jury and the instructions on the elements of first degree child abuse adequately explain the intent necessary to commit the crime. *See People v. Maynor*, 470 Mich. 289, 295-96, 683 N.W.2d 565, 568-69 (2004). In light of *Maynor*, CJI2d § 3.09 has been repealed.

deceased] was caused by the defendant, you must find beyond a reasonable doubt that the death was the natural or necessary result of the defendant's act."  However, the immediately following instruction, CJI2d § 16.16, provides in relevant part that it is no defense to the crime of murder if the defendant's acts were not the only cause, or if the immediate cause of death was improper medical treatment.  Here, there was no dispute as to causation: petitioner placed the victim in the tub, and she died from the scalding injuries she sustained as a result.  Rather, the dispute in the case was over petitioner's mental state.  Although petitioner argued that improper medical treatment was an intervening cause, this is not a cause which negates his criminal responsibility.  There was no argument by petitioner that the victim died of some other cause; rather there was evidence "only [of] the unsuccessful efforts of the medical community to overcome the harm inflicted by the defendant, and the acceptance by the victim's family of the reality of fatal injuries." *People v. Bowles*, 461 Mich. 555, 560, 607 N.W.2d 715, 718 (2000).  And the jury was given a general instruction that one of the elements of second degree murder was that petitioner caused the death of the victim and that one of the elements of first degree child abuse was that petitioner caused the victim's injuries. *See* Trial Tr., dated 6/13/01, at 136, 138.  Thus, petitioner cannot show that he was denied a fair trial by the absence of a causation instruction.

### d. Inferring State of Mind Instruction

Finally, petitioner contends that he was denied a fair trial by the court's failure to instruct the jury on inferring his state of mind pursuant to CJI2d § 16.21.  As relevant here, this instruction informs the jury that it should consider all of the evidence in deciding the defendant's state of mind, and that the state of mind "may be inferred from the kind of weapon used, the type of wounds inflicted, the acts and words of the defendant, and any other circumstances surrounding the alleged

killing." However, petitioner has failed to show how the absence of this instruction prejudiced him in any way. On the contrary, the inferring state of mind instruction is generally used at the behest of the prosecution, which seldom has direct evidence of a defendant's state of mind. To the extent that the jury did not make the common sense judgment that circumstantial evidence could be used to show petitioner's state of mind, it only could have concluded that direct evidence of petitioner's state of mind was required, a view which would have increased rather than lessened the prosecution's burden. Thus, petitioner cannot show that he was denied a fair trial by the absence of this instruction, and the Court should conclude that he is not entitled to habeas relief on this claim.

F.      *Prosecutorial Misconduct (Claim III)*

Petitioner next contends that he was denied a fair trial by several comments made by the prosecutor during closing and rebuttal argument. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally

placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

    2.    *Analysis*

Petitioner argues that he was denied a fair trial by several comments made by the prosecutor during closing arguments. The Court should conclude that these claims are without merit.

First, petitioner argues that the prosecutor committed misconduct by arguing that he was under stress at the time of the incident because he was unemployed and had no money. At trial, defendant testified that he had lost his job because he had to leave work to take care of the victim, and thus could not work overtime. *See* Trial Tr., Vol. IV, at 62. During closing argument, the prosecutor suggested that petitioner had committed the crime because money was tight for the family. Specifically, the prosecutor argued that the victim was having difficulty being potty trained, that petitioner had lost his job because of his need to care for the victim and money was tight in the family, and petitioner wanted to watch the football game that was on television, and that these factors taken together might provide an answer to the question "how could this happen?" Trial Tr., dated 6/13/01, at 70-71. This argument was based on the testimony adduced at trial concerning both petitioner's and the victim's mother's current employment status, and was a fair attempt by the prosecutor to provide an explanation for what appeared to be an otherwise inexplicable crime. As such, the argument was not improper.

Petitioner also contends that the prosecutor elicited sympathy for the victim by arguing: "Dead men tell no tails [sic]. Dead men tell no tails [sic]. In this case Alize Williams is crying from

the grave trying to tell us what happened to her. She is not here to tell us. So what do we have to rely on? We have to rely on her injuries and the testimony of experts to tell us what those injuries mean." Trial Tr, dated 6/13/01, at 60. Although the prosecutor's language may have been somewhat emotional, The prosecutor did not ask the jury to convict out of sympathy for the victim or appeal to the jury to act as the conscience of the community. Rather, the prosecutor merely explained the nature of the evidence upon which the jury's decision had to be based. Further, even if improper the prosecutor's references to the victim were much less prejudicial than other comments referring to victims which have been upheld on habeas review. *See, e.g.*, *Brechen v. Reynolds*, 41 F.3d 1343, 1355-56 (10th Cir. 1994); *United States ex. rel. Rockman v. DeRobertis*, 717 F. Supp. 553, 569-70 (N.D. Ill. 1989)(prosecutor's reference to victim "in his grave crying out for a guilty verdict" did not deprive petitioner of a fair trial); *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 896-96 (E.D. Ky. 1988)(petitioner was not denied a fair trial where, during the guilt-innocence phase of the trial, the prosecutor admonished the jury not to forget the victim because "he had a right to live."), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir. 1999)(en banc).

Petitioner also argues that the prosecutor committed misconduct by twice stating during closing argument that the trial court was required to instruct the jury on second degree murder as a lesser offense. *See* Trial Tr., dated 6/13/01, at 83, 86. However, this was a correct statement of Michigan law. *See People v. Jenkins*, 395 Mich. 440, 442, 236 N.W.2d 503, 504 (1975) (holding that "every charge of first-degree murder [including felony murder] necessarily includes the lesser offense of second-degree murder," and that "[b]ecause of the significant differences in the penalties between first- and second-degree murder, and because every charge of first-degree murder necessarily includes the lesser offense of second-degree murder, in every trial for first-degree

murder, including felony murder, the trial court is required to instruct the jury *sua sponte*, and even over objection, on the lesser included offense of second-degree murder.").  A prosecutor does not commit misconduct by making a correct statement of the law.  *See Moppins v. Ylst*, No. 91-16145, 1992 WL 51347, at *1 (9th Cir. Mar. 18, 1992); *Jones v. Oklahoma*, ___ F. Supp. 2d ___, ___, 2008 WL 623473, at *9 (W.D. Okla. Mar. 4, 2008); *Tucker v. Bennett*, 219 F. Supp. 2d 260, 268 (E.D.N.Y. 2002).  Further, petitioner has not identified any possible prejudice from the prosecutor's brief mention that the second degree murder instruction was required by law.

Petitioner next argues that the prosecutor made an improper civic duty argument when the prosecutor stated:

> Unfortunately, things like this happen in today's society all the time.  There's atrocities that one person commits on another all the time.  That's the way life is.  You don't like it.  That's the way mothers kill babies when they shake them, shaking baby syndrome.  We have fathers that kill babies, maybe they punch them.
> We can't phantom [sic] why somebody would do this, but we here [sic] of children killing parents.  We heard of people murder other people, and lots of times we look at it and we say why?   Why would something like that happen?  But it happens, and it happens every day.  Every day.

Trial Tr., dated 6/13/01, at 67-68.  Petitioner argues that this comment appeals to the jury's civic duty by placing the crime problem squarely before the jury.  The Court should disagree.  A "civic duty" argument is one which "encourages the jury to convict the defendant based upon principles of protection of the community and encourages them to ignore the evidence in the case."  *United States v. Mejorado-Soto*, No. 94-2404, 1995 WL 764115, at *2 (6th Cir. Dec. 27, 1995) (per curiam).  Here, the prosecutor did neither.  Rather, the prosecutor merely conceded that it was difficult to explain a motive for the crime, which appeared to be inexplicable.  The prosecutor did not suggest that the jury had to convict petitioner to protect the community.  This is evident from the comments immediately preceding and following the passage quoted above.  *See* Trial Tr., dated

6/13/01, at 67, 68.

Petitioner next argues that the prosecutor improperly argued facts not in evidence. During closing argument, petitioner's counsel argued that, had petitioner held the victim in the water with the child flailing, there would have been water everywhere, yet there was none on petitioner's clothes. *See id*. at 94. In rebuttal, the prosecutor argued: "Detective Martin talked to him a couple of hours later. His clothes weren't wet. Would his clothes get wet? Maybe, but Detective Martin talked to him hours later. Hours later, and his clothes weren't wet. He also, before the police got there, could have put on a different shirt. Remember, Alize was eating spaghettios just in her diaper. Maybe he put a shirt on before the police got there as [the] baby is lying on the towel. We don't know. That's not conclusive." *Id*. at 119-20. This argument does not constitute an impermissible reference to facts not in evidence. The prosecutor did not present these comments as assertions of fact, but rather as plausible reasons why petitioner's shirt might not have been wet even though he had held the victim in the tub. The prosecutor explicitly stated "We don't know" why petitioner's shirt was not wet and that "*[m]aybe* he put a shirt on before the police got there." In light of these qualifications included by the prosecutor in her argument, "the jurors would know that these comments were inferences, and they would not be confused into believing that these comments were factual evidence." *Byrd v. Collins*, 209 F.3d 486, 536 (6th Cir. 2000). Further, the comments were offered to rebut the argument of petitioner's counsel that the absence of water on petitioner's shirt was conclusive of his innocence. *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (one factor in evaluating claims of prosecutorial misconduct is whether the prosecutor's statement was "invited by or was responsive to the [closing argument] of the defense.").

Finally, petitioner contends that he was denied a fair trial by the prosecutor's misstatement

of law regarding the reasonable doubt standard. During rebuttal, the prosecutor argued: "Reasonable doubt. What is reasonable doubt? Judge is going to instruct on the law, but if you strip it down, you strip reasonable doubt down to what it actually, it's if you look at your heart of hearts and in your soul of souls, you believe that evidence presented shows that this man is guilty, then the case has been proven to you beyond a reasonable doubt." Trial Tr., dated 6/13/01, at 121. Although this statement does not comport with the standard definition of reasonable doubt, the trial court instructed the jury that the comments and arguments of counsel are not evidence, and provided a proper definition of the reasonable doubt standard. *See* Trial Tr., dated 6/13/01, at 124. Because the trial court correctly stated the law and admonished the jury that only its instructions on the law were to be followed, petitioner cannot show that he was prejudiced by the prosecutor's alleged misstatement of the law. *See United States v. Wadlington*, 233 F.3d 1067, 1079 (8th Cir. 2000); *United States v. Gonzalez-Gonzalez*, 136 F.3d 6, 9 (1st Cir. 1998).

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his prosecutorial misconduct claims.

G.      *Judicial Partiality (Claim IV)*

Petitioner next contends that the trial judge pierced the veil of judicial impartiality through several comments. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

Perhaps "[n]o right is more fundamental to the notion of a fair trial than the right to an impartial judge." *Bracy v. Gramley*, 81 F.3d 684, 696 (7th Cir. 1996) (Rovner, J., dissenting), *rev'd*, 520 U.S. 899 (1997); *see also*, Mass. Const. of 1780, pt. 1, art. 29. Thus, "the Due Process Clause

clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy*, 520 U.S. at 904-05 (citation omitted) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). "Because judicial bias infects the entire trial process it is not subject to harmless error review." *Maurino v. Johnson*, 210 F.3d 638, 645 (6th Cir. 2000) (citing *Chapman v. California*, 386 U.S. 18, 23 & n. 8 (1966)); *see also*, *Rose v. Clark*, 478 U.S. 570, 577 (1986) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)).

Habeas relief on the basis of judicial bias is appropriate only if "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995). As a general matter, habeas relief will be appropriate only upon a showing that the trial judge was actually biased or prejudiced against the petitioner. *See Fero v. Kerby*, 39 F.3d 1462, 1478 (10th Cir. 1994). However, in exceptional circumstances "the likelihood of bias or appearance of bias can, in certain circumstances, be so substantial as to create a conclusive presumption of actual bias." *Id.* (internal quotation omitted). The appearance of bias situation is limited to cases in which "a judge is faced with circumstances that present some actual incentive to find one way or the other[,]" *id.* (internal quotation omitted); *see also*, *Del Vecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc), such as where the judge has a pecuniary interest in the outcome or has been the target of repeated abuse by one of the parties. *See Six v. Delo*, 885 F. Supp. 1265, 1271 (E.D. Mo. 1995), *aff'd*, 94 F.3d 469, 478 (8th Cir. 1996).

As the Supreme Court has noted in the context of the federal recusal statute, "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the

case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); *see also*, *Liteky v. United States*, 510 U.S. 540, 549-51 (1994); *Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir. 1988). For this reason,

> judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved.

*Liteky*, 510 U.S. at 555. Thus, "[a] judge's ordinary efforts at courtroom administration–even a stern and short-tempered judge's ordinary efforts at courtroom administration–remain immune." *Id*. at 556. Although *Liteky* was decided on the basis of the federal recusal statute, it provides guidance for resolving habeas claims of judicial bias. *See Maurino*, 210 F.3d at 645; *Poland v. Stewart*, 117 F.3d 1094, 1103-04 (9th Cir. 1997).

Apart from judicial comments which show bias, a judge's comments will provide a ground for habeas relief only if the comments deprived the petitioner of a fair trial. Unlike an appellate court on direct appeal, a federal habeas court does not exercise supervisory powers over the state courts, *see Murphy v. Florida*, 421 U.S. 794, 797 (1975), and thus a federal court's habeas jurisdiction is limited to correcting violations of federal constitutional law; it does not have the authority to correct perceived injustices absent a constitutional violation. *See Guinan v. United States*, 6 F.3d 468, 470-71 (7th Cir. 1993); 28 U.S.C. § 2254(a) (emphasis added) (federal court has jurisdiction to entertain petition brought by state prisoner "*only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").[5]

---

[5]In contrast, a federal court may use its supervisory powers over lower federal courts and federal prosecutors to correct injustices. *See United States v. Leslie*, 783 F.2d 541, 569-70 (5th Cir. 1986) (en banc) (Williams, J., dissenting), *vacated*, 479 U.S. 1074 (1987); *United States v. Crawford*, 466 F.2d 1155, 1157 (10th Cir. 1972).

As the Sixth Circuit has explained:

> Unless they amount to constitutional violations, prejudicial comments and conduct by a judge in a criminal trial are not proper subjects for collateral attack on a conviction. In collateral proceedings, the test is whether the errors alleged could have rendered the trial fundamentally unfair. To violate a defendant's right to a fair trial, a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree.

*McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985) (internal quotations, citations, and alterations omitted). Or as the Ninth Circuit has explained, on habeas review "the question is not simply whether the trial judge committed misconduct or whether [a federal appellate court] would reverse a conviction obtained after a trial in which a federal judge behaved in the same manner. Rather, we must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995); *accord Harrington v. Iowa*, 109 F.3d 1275, 1280 (8th Cir. 1997). In other words, to warrant habeas relief "there must be an 'extremely high level of interference' by the trial judge which creates 'a pervasive climate of partiality and unfairness.'" *Duckett*, 67 F.3d at 740 (quoting *United States v. DeLuca*, 692 F.2d 1277, 1282 (9th Cir. 1982)).

2.      *Analysis*

Petitioner's judicial misconduct claims all revolve around his counsel's attempts to argue that the removal of the victim from life support was an intervening cause of death. During counsel's closing argument, counsel began to argue that the victim's condition was improving. The trial judge interrupted counsel, instructing the jury to disregard this portion of the statement because there was no evidence in the record to support it. *See* Trial Tr., dated 6/13/01, at 100. Nevertheless, counsel was able to continue in this vein, particularly highlighting his questioning of Dr. Wahl regarding the victim's normal temperature. *See id*. at 101. During instructions to the jury, the trial judge twice

indicated that the removal of the victim from life support was irrelevant. First, after explaining that the arguments of counsel are not evidence, the court explained:

> Let me indicate to you specifically, ladies and gentlemen, there was some reference in the closing argument that we heard this morning with regard to the fact that one point there was comment made about the fact that the skin of the deceased, Alize Williams, would grow back, and there was testimony with regard – there was argument with regard to the fact that the deceased would have survived if a colostomy had been performed.
>
> Ladies and gentlemen, I'm telling you as a matter of law in this case you cannot consider those comments. There was not evidence introduced in the record to either indicate that or from which an inference could be drawn.

*Id*. at 125-26. Later, instructing the jury on the elements of the offense, the court stated:

> Now, ladies and gentlemen, I want to indicate to you that with regard to – you have in fact heard some testimony, and there has been some argument and reference to the notion of life support being pulled in this particular case.
>
> With regard to this being pulled in this particular case with regard to this child, I want you to understand that under the law in the State of Michigan that the decision to carry out the termination or the stopping of life support treatment is not in the eyes of the law a cause of a patient's subsequent death.
>
> The discontinuance of life support measures merely allows the patient's injuries or illness to take its natural and inevitable course.

*Id*. at 136-37. The Michigan Court of Appeals rejected petitioner's claim, reasoning that (1) there was no evidence that the victim was recovering or that a colostomy would have saved her life, and thus the trial judge's comments were a proper attempt to control the proceedings; and (2) the removal of life support was not an intervening cause of death. *See League*, 2003 WL 21675849, at *12, slip op. at 13. The Court should conclude that this determination was reasonable.

At the outset, petitioner does not claim that the judge was biased against him, nor could he. Petitioner points only to comments of the trial judge making evidentiary or legal rulings in the course of the trial. As the Court explained in *Liteky*, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. Rather, petitioner claims only

that he was denied a fair trial by the judge's comments. The Court should disagree.

With respect to the court's comments on the victim's potential for recovery, as the court of appeals observed there was no evidence that the victim was recovering or that a colostomy would have saved her life. On cross-examination, Dr. Wahl did testify that he told the victim's mother that he had seen some improvement following the victim's operations, but explained that this was "a relative thing." *See* Trial Tr., dated 6/7/01, at 45. More relevant, in response to counsel's direct question on whether the victim was improving, Dr. Wahl denied that this was the case: "It's a relative thing. I think that she was never well. She was very sick the entire time she was there. So I don't think she was getting better. Let me compare to what, compared to having 90 percent of her skinned burned off, I don't think she ever really got better. She was sick the entire time she was there." *Id*. at 44. Thus, the trial court was correct in noting that counsel's statement during closing argument was not an accurate characterization of Dr. Wahl's testimony. Further, with respect to the life support issue, as explained in connection with petitioner's jury instruction claim regarding the causation instruction, *see supra* part E.2.c, as a matter of law the removal of the victim from life support was not an intervening cause of the victim's death. The comments were not "substantially adverse to the defendant himself," and "[t]here is no showing that the trial judge ever intimated [her] opinion on the merits of the case." *Todd v. Stegal*, 40 Fed. Appx. 25, 27 (6th Cir. 2002). Rather, the comments merely directed the jury's attention to the relevant facts and law governing its decision. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Sufficiency of the Evidence (Claim V)*

Petitioner next contends that the prosecution presented insufficient evidence to prove his

guilt of first degree murder beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how

a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, first degree murder includes "[*m*]*urder* committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping." MICH. COMP. LAWS § 75.316(1)(b) (emphasis added). Because the statute (unlike the common law felony murder doctrine) requires a murder, and not just a killing, committed during the course of one of the enumerated crimes, the prosecution must show that a defendant had the mental state necessary for murder, that is, malice aforethought. *See generally*, *People v. Aaron*, 409 Mich. 672, 713-21, 299 N.W.2d 304, 319-323 (1980); *People v. Turner*, 213 Mich. App. 558, 556, 540 N.W.2d 728, 732-33 (1995) (per curiam). Under Michigan law, malice is established by showing that the defendant possessed one of three mental states: (1) intent to kill; (2) intent to do serious bodily harm; or (3) wanton and willful disregard for the likelihood that the natural tendency of his act is to cause death or great bodily harm. *See Aaron*, 409 Mich. at 733, 299 N.W.2d at 328. Thus, the elements of first degree felony murder are: "(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result; (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in M.C.L. § 750.316." *Turner*, 213 Mich. App. at 566, 540

N.W.2d at 732.

2.      *Analysis*

Petitioner contends that there was insufficient evidence to establish that he acted with one of the three mental states necessary to support a conviction for murder. As petitioner notes, the prosecutor conceded that he could not prove an intent to kill, and thus only the intent to do great bodily harm and wanton and willful disregard states of mind are at issue. Petitioner contends that the evidence was insufficient because the only evidence of his state of mind was an inference drawn from the victim's injuries, and the medical experts testified that those injuries could have occurred in as little as five seconds. The court of appeals rejected this claim, reasoning that the "[u]ncontroverted medical testimony and evidence [that] was presented . . . established that Alize was forcibly submersed in scalding water and that she suffered partial and full thickness burns over ninety percent of her body. This evidence is sufficient to support a finding that defendant had the intent to commit great bodily harm or had a wanton and willful disregard of the likelihood that the natural tendency of his behavior was to cause death or great bodily harm." *League*, 2003 WL 21675849, at *11, slip op. at 12. The Court should conclude that this determination was reasonable.

It is well established that the malice element of second degree murder may be inferred from the circumstances of the death. *See People v. Werner*, 254 Mich. App. 528, 531, 659 N.W.2d 688, 692 (2002); *People v. Mackey*, 168 Mich. App. 154, 157, 423 N.W.2d 604, 606 (1988). In particular, malice may be inferred from evidence that establishes "the intent to do an act that is in obvious disregard of life-endangering consequences." *People v. Aldrich*, 246 Mich. App. 101, 123, 631 N.W.2d 67, 80 (2001). In petitioner's case the medical evidence, if credited by the jury, established that the victim was placed in a tub filled with scalding hot water and was held down in

the tub. The medical testimony contradicted any claim that the victim had entered the tub on her own. While there was testimony that the victim's scalding of a child could occur in 135 degree water in as little as five seconds, the medical testimony also established that the pattern of burns the victim sustained could only be explained by the victim being forcibly held in the tub, rebutting any claim that petitioner may have been merely negligent. From this evidence, a rational trier of fact could have concluded from the evidence that petitioner "intentionally set in motion a force likely to cause death or great bodily harm," *Aaron*, 409 Mich. at 729, 299 N.W.2d at 327; *accord People v. Cairns*, 460 Mich. 750, 759, 597 N.W.2d 130, 136 (1999), or acted in wanton and willful disregard of the natural tendency of his actions to cause death or great bodily harm, and thus acted with the malice aforethought necessary to sustain a conviction for murder. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I. *Ineffective Assistance of Counsel (Claim I)*

Finally, petitioner contends that his counsel rendered constitutionally deficient performance in a number of respects. Specifically, petitioner contends that his counsel was ineffective for failing to: (1) properly investigate and prepare the defense; (2) call witnesses; (3) challenge the admissibility of his statement; (4) object to prosecutorial misconduct; and (5) request proper jury instructions. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1. *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were

so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

2.    *Analysis*

a. *Investigation/Knowledge of the Law/Choice of Defense*

Petitioner first contends that his counsel was not adequately prepared for trial because counsel did not understand the applicable law, failed to investigate expert witnesses, and chose a poor defense strategy. The Court should conclude that petitioner is not entitled to habeas relief on

this claim.

Petitioner argues that counsel did not understand the mental states required for murder, as demonstrated by his statements during opening argument–which were corrected by the trial court–that the prosecution had to prove that petitioner intended to kill the victim. *See* Trial Tr., dated 6/6/01, at 21-22. While it is true that counsel misspoke regarding the elements of first degree murder, it is not clear if this was an actual misunderstanding of the law, or merely an attempt by counsel to hold the prosecutor to the highest standard of proof that he possibly could. In any event, petitioner has not explained how he was prejudiced by counsel's alleged misunderstanding. The focus of the trial was not on which of the three mental states petitioner had–under the prosecution's version of events the malice aforethought requirement was easily satisfied. Rather, the focus of the trial was on the intent element of the underlying felony–first degree child abuse. Petitioner's defense at trial was that the victim had turned on the tub herself, and that he did not intend to hurt her in any way. This point was emphasized by counsel during closing argument, *see* Trial Tr., dated 6/13/01, at 116-17, and indeed the bulk of counsel's closing went to explaining to the jury how the medical evidence supported petitioner's, rather than the prosecutor's, version of events, *see id.* at 93-101, 111-15, 117-18. Counsel properly, albeit unsuccessfully, argued that there was no murder–indeed no crime at all–because the evidence did not support the prosecutor's theory that petitioner had deliberately placed the victim in the tub to punish her, but rather showed that the victim turned the water on her self and went into shock as a result of the scalding.

Petitioner also argues that counsel failed to explain the three possible mental states sufficient to support a murder charge and that, had he known of these mental states, he might have been willing to plead to a lesser charge rather than risk trial. "A defense attorney's failure to notify his

36

client of a prosecutor's plea offer constitutes ineffective assistance of counsel under the Sixth Amendment and satisfies the first element of the *Strickland* test." *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003). To satisfy the prejudice element of the *Strickland* test, petitioner must show "that there is a reasonable probability the petitioner would have pleaded guilty given competent advice." *Id.* Of course, the antecedent question in resolving such a claim is whether the prosecutor in fact extended any plea bargain to defense counsel. *See Guerrero v. United States*, 383 F.3d 409, 417 (6th Cir. 2004); *Wanatee v. Ault*, 101 F. Supp. 2d 1189, 1200-01 (N.D. Iowa 2000). Here, petitioner's claim founders on this antecedent question. There is absolutely no evidence that the prosecutor ever offered, or even contemplated offering, a plea deal to petitioner. Indeed, on petitioner's direct appeal the prosecutor who tried the case offered an affidavit stating that no plea deal was considered because the evidence was overwhelming. *See League*, 2003 WL 21675849, at *6, slip op. at 6. Thus, petitioner cannot show that he was prejudiced by counsel's failure to discuss with him the mental states upon which a murder conviction could be based.

Petitioner also argued that counsel's pretrial preparation was deficient because he failed to contact or present an expert witness to support his defense. Petitioner has presented no evidence that there were any expert witnesses who could or would have testified in the manner he suggests in his brief. He has identified no specific experts, nor pointed to anything which suggests that such experts would have testified on his behalf. In these circumstances, petitioner has failed to meet his burden of establishing prejudice. *See Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002); *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001); *Tafaya v. Tansy*, 9 Fed. Appx. 862, 871, 2001 WL 557971, at *6 (10th Cir. 2001); *Dell v. Straub*, 194 F. Supp. 2d 629, 650-51 (E.D. Mich. 2002) (Friedman, J.). Further, petitioner cannot show that he was prejudiced by the absence of a defense

expert. For the most part, petitioner claims that a defense expert could have challenged the prosecutor's version of events. However, as noted above, counsel cross-examined the prosecution experts extensively, and was able to forcefully argue that the expert testimony did not support the prosecutor's version of events. Petitioner has identified no expert who would have been willing to testify, nor has he explained how an expert might have testified differently from the prosecution's experts. "Speculation about what an expert could have said is not enough to establish prejudice." *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997). Thus, petitioner has failed to show a reasonable probability that the outcome of the trial would have been different had counsel sought an expert witness. *See Hamblin v. Mitchell*, 354 F.3d 482, 494 (6th Cir. 2003) (petitioner not entitled to relief where "even if defense counsel had called an expert witness to testify[,]…it would not likely have changed the outcome" of the case.).

Finally with respect to counsel's preparation, petitioner contends that counsel was ineffective for pursuing the intervening cause defense, which was not available as a matter of law. Again, petitioner cannot establish prejudice. Had counsel rested his entire case on this line of defense, prejudice could be shown. Here, however, the intervening cause argument was not counsel's principal, let alone sole, line of defense. Rather, while counsel did attempt to convey to the jury that the victim had a chance to survive if she had not been pulled off life support, the bulk of counsel's defense was that the victim's injuries were a tragic accident resulting from the victim having turned on the tub herself. The majority of counsel's cross-examination of the prosecutor's witnesses, as well as his closing argument, was devoted to this line of defense. The pursuit of the intervening cause defense did not weaken petitioner's main defense to the charges nor did it distract counsel from vigorously arguing that defense, and petitioner has not explained how he was prejudiced by

counsel's pursuit of the ultimately futile intervening cause line of defense.

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these ineffective assistance of counsel claims relating to counsel's pretrial performance.

### b. Failure to Call Witness

Petitioner next contends that his counsel was ineffective for failing to call Sandra Richardson as a witness. According to petitioner, she would have confirmed his testimony that he talked to her while he was bathing the victim. The Michigan Court of Appeals rejected petitioner's claim, concluding that petitioner was not prejudiced because "the prosecutor did not dispute the fact that defendant received a telephone call as he was preparing to bath Alize." *League*, 2003 WL 21675849, at *7, slip op. at 7. This determination was reasonable. Petitioner testified to receiving the phone call, and the prosecutor did not cross-examine him on this fact or focus on it during closing argument. While the fact of the phone call was part of petitioner's version of events, this portion was irrelevant to the main issues in the case and was not the subject of any dispute. In these circumstances, petitioner cannot show that he was prejudiced by counsel's failure to call Richardson as a witness to corroborate the phone call. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Failure to Challenge Statement

Petitioner next argues that counsel was ineffective for failing to challenge the admissibility of his statements to the police. Petitioner argues that he was coerced into waiving his *Miranda* rights, and that the statements were involuntary. Specifically, petitioner contends that his first *Miranda* waiver and statement was involuntary because he had been detained in a cell for five hours, he was distraught, and had not eaten since the afternoon. He contends that the second and third

statements were involuntary because he was dressed only in his socks and shorts (the other clothing having been removed because he was on suicide watch), and because the police promised to help him if he cooperated. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

As the Supreme Court explained in *Jackson v. Denno*, 378 U.S. 368 (1964), "a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession." *Jackson*, 378 U.S. at 376. "Determining whether a confession is 'voluntary' for due process purposes entails an examination into the 'totality of the circumstances' to determine whether the confession was procured by acceptable techniques that draw upon an essentially free and unconstrained choice or by unacceptable tactics that extract their results from an overborne will. The critical line of distinction is between 'self-direction' and 'compulsion.'" *Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *accord Dickerson*, 120 S. Ct. at 2331. It is not enough that a defendant's will was "overborne" by some factor for which state officials are not responsible. "Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession." *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). There is no bright line test for determining whether a confession is voluntary, nor is any one factor dispositive. Rather, a court must "look[] to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case. Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the

questioning; and the use of physical punishments, such as the deprivation of food or sleep." *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999) (internal quotation and citation omitted); *accord*, *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997); *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).[6]

Here, there is no evidence that petitioner's statements were the result of police coercion sufficient to overbear his will.[7] Even assuming the truth of petitioner's allegations, he cannot show a reasonable probability that a motion to suppress would have been granted, and thus he cannot show that counsel's performance prejudiced him. Although petitioner claims that he was tired and (with respect to the first statement) had not eaten in a while, petitioner does not identify any police conduct which overbore his will. He does not allege that he asked for and was denied food by the police, or that the police prevented him from sleeping. He does not allege that any of the three interrogations were particularly long. While he does claim that he was wearing only his shorts and socks, he does not allege that the physical conditions of the room were such that it rendered him uncomfortable, or that he was clad thusly by the police to humiliate or degrade him. Further,

---

[6]Petitioner's *Miranda* claim is derivative of his voluntariness claim. That is, he claims that the waiver of his *Miranda* rights was involuntary for the same reasons that the statements themselves were involuntary. Thus, the Court need not consider the *Miranda* issue separately.

[7]Notably, petitioner did not develop any such evidence in the state courts. Although he filed an affidavit in connection with his state court appeal averring that counsel never discussed with him the facts and circumstances surrounding the taking of the statements, he did not provide any detail as to what those facts and circumstances were, and petitioner's request to remand was denied on that basis. *See League*, 2003 WL 21675849, at *7, slip op. at 8. The Michigan Court Rules expressly provide that a motion to remand "must be supported by affidavit or offer of proof regarding the facts to be established at a hearing." MICH. CT. R. 7.211(C). Petitioner's failure to comply with this rule precludes an evidentiary hearing here. *See Burt v. Berghuis*, No. 1:02-cv-623, 2007 WL 2791106, at *24 & n.3 (W.D. Mich. June 13, 2007); *White v. Cason*, No. 04-CV-75071, 2006 WL 763194, at *14 (E.D. Mich. Mar. 24, 2006) (Steeh, J., adopting recommendation of Komives, M.J.).

although he alleges that the police offered to "help him," he does not allege that any specific promises were made or inducements offered in exchange for his statement. Vague promises that a confession will help a suspect do not render the confession involuntary. *See United States v. Burgess*, 33 Fed. Appx. 386, 389 (10th Cir. 2002); *United States v. Jarwal*, 47 F.3d 539, 542 (2d Cir. 1995). Thus, petitioner has provided nothing to show a reasonable probability that, had a motion to suppress the statements been filed, it would have been granted. Accordingly, he is not entitled to habeas relief on this ineffective assistance claim.

### d. Failure to Object to Prosecutorial Misconduct

Petitioner next contends that his counsel was ineffective for failing to object to the improper prosecutorial statements upon which he seeks habeas relief. As discussed above, petitioner's underlying prosecutorial misconduct claims are without merit, and thus he cannot show that his counsel was ineffective. *See White v. Withrow*, No. 00-CV-74231, 2001 WL 902624, at *12 (E.D. Mich. June 22, 2001) (Rosen, J.) (citing *United States v. Nwankwo*, 2 F. Supp. 2d 765, 770 (D. Md. 1998)) (no prejudice from counsel's failure to object to prosecutorial misconduct where prosecutor's comments did not deprive petitioner of a fair trial); *Rich v. Curtis*, No. 99-CV-73363, 2000 WL 1772628, at *8 (E.D. Mich. Oct. 24, 2000) (Friedman, J.) (same)

### e. Failure to Request Jury Instructions

Finally, petitioner contends that counsel was ineffective for failing to request the various jury instructions the omission of which he contends denied him a fair trial. As discussed above with respect to all but petitioner's proposed lesser offense instruction, the instructions as given were complete and accurate, and the specific instructions petitioner seeks were either adequately covered by other instructions or not warranted under state law. Thus, petitioner cannot show that his counsel

was ineffective with respect to these jury instruction matters.

With respect to the lesser offense instruction, petitioner contends that his counsel should have requested an instruction on second degree child abuse as a lesser offense of first degree child abuse. He also contends that he was prejudiced by counsel's failure to request the instruction because second degree child abuse is not a predicate felony for first degree felony murder, and thus if the jury convicted him on this lesser child abuse offense it could not have convicted him on the murder offense. The court of appeals noted that petitioner has failed to identify any authority for the assertion that second degree child abuse is a necessarily included offense of first degree child abuse, but even assuming that it was petitioner was not entitled to relief because counsel made a reasonable "all or nothing" choice. *See League*, 2003 WL 21675849, at *6, slip op. at 6.

Regardless of the reasonableness of this determination, petitioner is not entitled to habeas relief on this claim because he cannot show that he was prejudiced by counsel's failure to request an instruction on second degree child abuse. Under Michigan law, a lesser offense instruction is appropriate only where (1) the offense is a necessarily included, rather than cognate, lesser offense; and (2) a rational view of the evidence supports the instruction. *See People v. Mendoza*, 468 Mich. 527, 533, 664 N.W.2d 685, 688 (2003).[8] The Michigan child abuse statute provides that "[a] person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child." MICH. COMP. LAWS § 750.136b(2). The statute further provides that "[a] person is guilty of child abuse in the second degree if any of the following apply:

---

[8]A necessarily included offense is a lesser offense all of the elements of which are also elements of the greater offense. A cognate lesser offense is an offense which shares some elements of, and is part of the same class as, the greater offense but which also includes elements not required for the greater offense. *See Mendoza*, 468 Mich. at 532 nn.3-4, 664 N.W.2d at 688 nn.3-4.

(a) The person's omission causes serious physical harm or serious mental harm to a child or if the person's reckless act causes serious physical harm to a child.  (b) The person knowingly or intentionally commits an act likely to cause serious physical or mental harm to a child regardless of whether harm results.  (c) The person knowingly or intentionally commits an act that is cruel to a child regardless of whether harm results."  MICH. COMP. LAWS § 750.136b(3).  In light of the nature of the victim's injuries, neither the second or third forms of second degree child abuse were supported by a rational view of the evidence.  With respect to the first type of second degree child abuse, even if an instruction on this crime would have been appropriate, petitioner cannot show that he was prejudiced.  The jury was presented with two starkly different accounts of the events leading to the victim's death–either the prosecutor's version in which petitioner forcibly held the victim in the scalding water or petitioner's version in which the victim turned on the water herself.  Had the jury accepted petitioner's version, it simply could not have convicted him of either murder or first degree child abuse.  And the jury had before it the option of convicting petitioner of second degree murder if it felt that the elements of first degree child abuse was not satisfied.  The case was not an "all or nothing" case because of counsel's decision not to request a second degree child abuse instruction, but because of the nature of the evidence presented.  Thus there is not a reasonable probability that the outcome of the trial would have been different had counsel requested an instruction on second degree child abuse, and petitioner therefore cannot show that he was prejudiced by counsel's failure to request the instruction.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

J.      *Cumulative Error (Claim VI)*

        Finally, petitioner contends that he was denied a fair trial by the cumulative effect of the

errors in his trial. The Court should conclude that petitioner is not entitled to habeas relief on this basis. It is true that "[e]rrors which standing alone may be deemed harmless or insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting which is fundamentally unfair." *Payne v. Janasz*, 711 F.2d 1305, 1316 (6th Cir. 1983) (Jones, J., dissenting); *accord Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983). This rule, however, applies only to constitutional errors; the accumulation of non-errors cannot collectively amount to a violation of due process. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999); *McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995); *Fero v. Kerby*, 39 F.3d 1462, 1475 (10th Cir. 1994). As noted and discussed in this Report, none of petitioner's claims establish constitutional error, and thus his cumulative error claim fails.

K.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th

Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE
Dated: 6/10/08


The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on June 10, 2008.

                        s/Eddrey Butts
                        Case Manager